**New Hampshire Electrical**
**Cooperative, Inc.**

     v.                             Civil No. 16-cv-440-PB
                                          Opinion No. 2017 DNH 131

**Elster Solutions, LLC, et al.**

## MEMORANDUM AND ORDER

This case arises from a contract in which Elster Solutions, LLC ("Elster") agreed to provide goods, software, and services to the New Hampshire Electrical Cooperative, Inc. ("Cooperative") to establish an integrated metering system for the Cooperative's 83,000 electric customers. The Cooperative alleges that "smart" meters delivered and installed by Elster, which are an essential component of the metering system, began to fail at an unacceptably high rate. According to the Cooperative, these meter failures are the result of a manufacturing defect that Elster either knew about or should have discovered before the contract went into effect. It also claims that Elster concealed the defect and misrepresented the rate at which its meters fail during contract negotiations.

The Cooperative's allegations provide the basis for a complaint asserting that Elster and its parent, Honeywell

International, Inc., are liable for breach of contract, intentional and negligent misrepresentation, breach of warranty, unjust enrichment, breach of the duty of good faith and fair dealing, and breach of New Hampshire's Consumer Protection Act. Elster and Honeywell have attacked the complaint in a motion to dismiss for failure to state a claim.

## I.  BACKGROUND

The Cooperative's contract with Elster obligates Elster to provide "certain goods, software and services as determined herein to provide an Advanced Metering Infrastructure (AMI) system (the 'system') for electric meters purchased by NHEC."[1] Doc. No. 13-4 at 2.  Among other things, the contract obligates Elster to supply smart meters for each of the Cooperative's 83,000 customers.  See Doc. No. 1 ¶ 5-6, 10.  The smart meters are designed to provide information to the Cooperative concerning each customer's electric usage and inform the Cooperative of any power outages.  Unlike traditional electric meters, smart meters are designed to report usage and outage information to the Cooperative via radio frequency.  Each smart

---

[1] I cannot offer an authoritative interpretation of the contract or even determine whether the contract is ambiguous at this stage of the proceedings because the parties have supplied me with only selected excerpts of the contract.  Instead, I only determine whether the complaint states viable claims for relief if what the complaint says about the contract is true.

meter operates as a link in a chain with other smart meters. Information from one meter is reported to a nearby meter, which in turn adds its own information and reports the collected data up the chain to the next meter. The aggregated data is eventually forwarded to a "gate keeper" unit that transmits the data directly to the Cooperative. A failure of one meter in a chain thus can prevent the Cooperative from receiving information from all downstream meters. See id. ¶ 7-9.

The contract contains a warranty that "equipment shall be delivered free of defects in material and workmanship and that services shall be performed in a good and workmanlike manner." Doc. No. 12-1 at 7. If Elster breaches this warranty, it must, at its option, either "(i) repair or replace the nonconforming portion of the equipment or re-perform the nonconforming services or (ii) refund the portion of the price applicable to the nonconforming portion of equipment or services." Id. The contract also states that "THE REMEDIES STATED HEREIN CONSTITUTE PURCHASER'S EXCLUSIVE REMEDIES AND VENDOR'S ENTIRE LIABILTY FOR BREACH OF WARRANTY." Id.

All 83,000 meters delivered and installed under the contract contain a manufacturing defect. See Doc. No. 1 ¶ 17, 23. Elster first notified the Cooperative of the defect on March 16, 2012, after approximately 50,000 of the 83,000 meters called for by the contract had been installed. Id. ¶ 14. This

notice was followed by two bulletins providing additional
information concerning the defect.  Id. ¶ 15.  Although Elster
has stated that the defect is present in only the approximately
54,000 of the Cooperative's meters that were manufactured
between December 2009 and March 2012, see id. ¶ 16, a company
representative informed the Cooperative that all of its 83,000
meters contained the defect, which the representative explained
was an improperly sized computer chip, see id. ¶ 17.

     As the rollout progressed, meters began to fail.  They
frequently lost usage data or falsely reported power outages.  A
total of 5,500 meters have failed so far, sometimes at a rate of
40 meters per week.  This represents a failure rate in excess of
6%.  Further, because the Cooperative was receiving so many
false reports of power outages, it could no longer use the
system's power outage reporting feature.  Although the
Cooperative demanded that Elster replace all of the defective
meters immediately, Elster maintained that it was entitled to
replace meters one at a time as they failed.

     During the negotiations that led to the contract, Elster
told the Cooperative that "Elster's meters, Gatekeepers and
repeaters have a failure rate of less than 0.3%.  This is
calculated by dividing the number of failed units by the number
of units shipped."  Id. ¶ 12.  It also represented that its
meters have a typical lifespan of twenty years.  See id.

Considering these representations together, the Cooperative reasonably expected that only approximately 250 meters were likely to fail during the first twenty years in which the system was in operation.  Id.  The Cooperative alleges that Elster knew or should have known when it entered into the contract that its smart meters included a manufacturing defect and that meters containing the defect were failing at a substantially higher rate than Elster had claimed during the contract negotiation process.  See id. ¶ 62, 67–69.  Nevertheless, Elster concealed the manufacturing defect from the Cooperative and affirmatively misrepresented the meters' expected failure rate and lifespan.  See id. ¶ 63, 67–69.

## II.  STANDARD of REVIEW

To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is facially plausible if it provides "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," id., but "simply calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence" of wrongdoing.  Twombly, 550 U.S. at 556.

I employ a two-step approach in deciding a Rule 12(b)(6) motion.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  First, I screen the complaint for statements that "merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action."  Id. (citations, internal punctuation, and alterations omitted).  I then accept as true all non-conclusory factual allegations and the reasonable inferences drawn therefrom, and determine whether the claim is plausible.  Id.

### III.  ANALYSIS

Elster challenges the Cooperative's contract claim by arguing that the contract only requires it to repair, replace, or refund the cost of a meter when it fails, a duty Elster claims it has fulfilled.  It challenges the misrepresentation claims by contending both that the Cooperative has failed to plead its claims with the particularity required by Rule 9(b) and that the claims seek only nonrecoverable economic losses. It then challenges the remaining claims on other grounds that are specific to each claim.

### A.  Breach of Contract

The Cooperative alleges that Elster breached its express contractual warranty to provide meters that are free of material

defects.  To support this assertion, it claims that all of the
83,000 meters it acquired from Elster contain a manufacturing
defect, that the meters have been failing at such an
unacceptably high rate that it is unable to operate certain
features of the integrated metering system it contracted with
Elster to provide, and that Elster has failed to address the
problem in the manner required by the contract.  Elster argues
in response that even if all of its meters contain a
manufacturing defect, its only obligation under the contract is
to repair, replace, or refund the cost of a defective meter when
it fails.  Because it has agreed to fulfill this obligation
whenever a meter fails, Elster argues, the Cooperative has
failed to plead a viable breach of contract claim.

I am not persuaded by Elster's argument.  Elster agreed to
provide meters that are capable of performing certain essential
functions.  All of the 83,000 meters provided under the contract
allegedly contain a manufacturing defect that causes the meters
to fail at an unacceptably high rate.  The excessive failure
rate makes it impossible for the Cooperative to use any of its
meters to perform one or more of their contracted-for functions.
Under these circumstances, Elster cannot fulfill its contractual
obligations to the Cooperative merely by replacing meters when
they cease to function.  Accordingly, I deny Elster's motion to
dismiss the Cooperative's contract claim.

**B.    Misrepresentation Claims**

1.    Rule 9(b)

Elster argues that the Cooperative's claims for intentional misrepresentation, negligent misrepresentation, breach of the covenant of good faith and fair dealing, and violation of the New Hampshire Consumer Protection Act (the "CPA") fail to satisfy the heightened pleading standard required by Rule 9(b) for fraud claims.

For claims "where the core allegations effectively charge fraud," the heightened pleading requirements of Rule 9(b) apply. See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009). Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff satisfies Rule 9(b) by alleging "the who, what, where, and when of the allegedly false or fraudulent representation." Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir. 2004) (quoting Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004)). A plaintiff may allege knowledge or scienter "generally," but must still allege facts that meet the plausibility standard of Rule 8(a). See Fed. R. Civ. P. 9(b) and 8(a); Iqbal, 556 U.S. at 686–87.[2]

_____

[2] The First Circuit has required plaintiffs to support a scienter claim with "specific facts that make it reasonable to believe

The Cooperative has satisfied these pleading requirements with respect to the four misrepresentation claims challenged by Elster.  The Cooperative has identified the contents of the core misrepresentations underlying the four claims: that Elster's meters had a failure rate of .3% and a lifespan of twenty years. See Doc. No. 1 ¶ 63 (fraud), 67-68 (negligent misrepresentation), 45-46 (implied covenant), 76, 80 (CPA); see also Doc. No. 13-1 at 13.  The Cooperative has likewise specified that the misrepresentations occurred during the "request for proposal" process preceding the February 2011 contract and are contained in Elster's response to the Cooperative's request for proposal, see Doc. No. 1 ¶ 12; see also Pl.'s Ex. 1 at E-9 (offered Jan. 25, 2017) (failure rate), and in the parties' contract itself, Pl.'s Ex. 3 at 190 (offered Jan. 25, 2017) (failure rate).  See Doc. No. 13-1 at 13. Although the Cooperative did not identify the individual who made the misrepresentations in its complaint, it later placed in the docket what appears to be the cover letter to Elster's response to the Cooperative's request for proposal.  See Doc. No. 13-3.  The cover letter is signed by a senior vice president

---

that defendant knew that a statement was materially false or misleading."  Cardinale, 567 F.3d at 13 (quoting Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir. 1992)).  I construe the rule in Cardinale to be consistent with Iqbal.  Cf. Orion Seafood Int'l, Inc. v. Supreme Grp. B.V., 2012 DNH 146, 5.

of Elster and identifies another employee as the "point of
contact" for the response.  Id. at 2.  These allegations
adequately describe Elster's alleged misrepresentations.

The Cooperative has also alleged sufficient facts to allow
a reasonable inference of scienter.  Under New Hampshire law,
fraud requires a "representation . . . made with knowledge of
its falsity or with conscious indifference to its truth" and the
intention to cause reliance.  Tessier v. Rockefeller, 162 N.H.
324, 332 (2011) (quoting Patch v. Arsenault, 139 N.H. 313, 319
(1995)).  Negligent misrepresentation requires a failure "to
exercise reasonable care to verify the truth of [a
misrepresentation]."  Wyle v. Lees, 162 N.H. 406, 413 (2011).
Similarly, "the implied good faith obligations of a contracting
party are tantamount to the traditional duties of care to
refrain from misrepresentation and to correct subsequently
discovered error . . . ."  Centronics Corp. v. Genicom Corp.,
132 N.H. 133, 139 (1989).  To prove a violation of the relevant
CPA provisions in this case, the Cooperative can satisfy the
statute's scienter requirement by alleging that Elster "made
representations, knowing [it] lacked sufficient knowledge to
substantiate them."  Cf. Beer v. Bennett, 160 N.H. 166, 171
(2010).

Because the Cooperative has alleged facts allowing, at a
minimum, a reasonable inference of Elster's conscious

indifference at the time of contract formation, the mental states required for all four misrepresentation claims have been sufficiently pled. Relying on a bulletin Elster sent to its customers, the Cooperative alleged that the manufacturing process related to the improperly sized computer chip began in December 2009, preceding the contract by over a year. See Doc. No. 1 ¶ 18; Doc. No. 12-3. A customer notified Elster of issues with the meters in "late 2011." See Doc. No. 12-3. Paired with the reasonable inference that Elster would have been closely involved in the design and manufacture of its meters, the facts as alleged plausibly suggest that Elster was at least consciously indifferent to the existence of the improperly sized chips (and by extension the failure rate and lifespan of the meters) as of February 2011 and made misrepresentations with the intent to induce the Cooperative to contract.[3] Accordingly, the Cooperative's claims for (1) fraud, (2) negligent misrepresentation, (3) breach of the covenant of good faith and

_____

[3] Elster also argues that the Cooperative cannot base its claims on Elster's customer bulletins because those bulletins qualify as subsequent remedial measures that will be inadmissible at trial pursuant to Fed. R. Evid. 407. I decline to consider Elster's argument at this stage of the proceedings because Elster provides no support for its conclusory assertion that a court may dismiss a claim pursuant to Fed. R. Civ. P. 12(b)(6) simply because evidence cited in support of the claim may be inadmissible at trial.

fair dealing, and (4) violation of the CPA do not fail on Rule 9(b) grounds.

## 2. The Economic Loss Doctrine

Elster also argues that the economic loss doctrine precludes the Cooperative's fraud and negligent misrepresentation claims. "The economic loss doctrine is a 'judicially-created remedies principle that operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship.'" Wyle v. Lees, 162 N.H. 406, 410 (2011) (quoting Plourde Sand & Gravel v. JGI Eastern, 154 N.H. 791, 794 (2007)). In the context of products liability, "[e]conomic losses encompass both damage to the defective product itself and the diminution in value of the product because it is inferior in quality." Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 835 (2005). Put another way, economic loss includes "loss[es] resulting from the failure of the product to perform to the level expected by the buyer and is commonly measured by the cost of repairing or replacing the product." See Lempke v. Dagenais, 130 N.H. 782, 792 (1988).

Elster argues that the Cooperative's misrepresentation claims are barred by the economic loss doctrine because the relief the Cooperative seeks on those claims is limited to the value of the allegedly defective meters and other associated

economic costs that the Cooperative has incurred or will incur
in the future.  Even if I accept Elster's characterization of
the Cooperative's damages claim for purposes of analysis, I am
unpersuaded by its argument because the Cooperative's
misrepresentation claims fall within a well-recognized exception
that allows for the recovery of economic losses that result from
misrepresentations made to induce a contract.

The New Hampshire Supreme Court recognized this exception
in Wyle, 162 N.H. at 411–12.  There, the plaintiff purchased an
apartment building in reliance on the seller's false
representation that past modifications to the building had been
made with all required permits.  Id. at 409, 412.  In allowing
the plaintiff's claim for economic losses, the court
distinguished misrepresentations made to induce a contract,
which are exempt from the economic loss doctrine, from claims
based on a breach of a promise to perform the contract itself,
which are not.  See id. at 411–12.  The court concluded that the
defendant's representation — that he had obtained all required
permits when modifying the building that was the subject of the
contract — was not governed by the economic loss doctrine
because the representation was made to induce the contract and
was unrelated to the performance of the contract itself.  See
id. at 412; cf. Schaefer v. IndyMac Mortg. Servs., 731 F.3d 98,
109 (1st Cir. 2013) ("We read Wyle as holding that the negligent

misrepresentation exception reaches only those representations that precede the formation of the contract or that relate to a transaction other than the one that constitutes the subject of the contract.").

Applying Wyle to the facts of the present case, I conclude that the Cooperative's misrepresentation claims fall within the inducement exception. Elster contends otherwise because the representations at issue here concern the subject matter of, or the performance expected under, the contract, but it does not explain how its position can be squared with Wyle. In the present case, as in Wyle, the alleged misrepresentation occurred during the negotiation of the contract and the claims are not a mere repackaging of a breach of contract claim. Further, although the misrepresentations at issue in this case concerned the product that Elster was proposing to sell, that was also the case in Wyle. Thus, Wyle cannot be distinguished on this basis. Accordingly, the Cooperative's misrepresentation claims are not barred by the economic loss doctrine.[4]

---

[4] I emphasize that the Cooperative does not merely allege a misrepresentation on Elster's part, but a misrepresentation that induced the Cooperative to contract. See Doc. No. 1 ¶ 63-64, 71-72. The complaint adequately alleges inducement, but it remains open to Elster to challenge the factual basis for inducement after discovery.

**C.  Miscellaneous Challenges**

Elster also launches targeted attacks at the Cooperative's CPA, good faith and fair dealing, and unjust enrichment claims.

1.  CPA Claim

The Cooperative identified misrepresentations about meter quality as the core allegations underlying its CPA claim.  See Doc. No. 1 ¶ 76-77; Doc. No. 13-1 at 20-21.  Elster seeks to defeat this claim by arguing that Elster's dealings with the Cooperative are exempt from the CPA's coverage.[5]

The CPA prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce."  N.H. Rev. Stat. Ann. § 358-A:2.  After stating this broad prohibition, the statute goes on to list specific examples of unlawful conduct, including "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are another."  § 358-A:2 (VII).  The Cooperative cites this specific provision as a basis for its CPA claim.

---

[5] Elster also argues that "an ordinary breach of contract claim" cannot be the basis for a CPA claim.  See Doc. No. 12 at 22. This argument fails in the present circumstances.  Cf. Beer, 160 N.H. at 171 (where unlawful conduct involved party who "made representations, knowing [it] lacked sufficient knowledge to substantiate them," conduct was not mere breach of contract).

The CPA exempts from its coverage "[t]rade or commerce that is subject to the jurisdiction of . . . the public utilities commission." § 358-A:3 (I). "[T]o determine when offering for sale or distributing a service is 'subject to the jurisdiction of' the PUC, [courts] examine the statutes that define the PUC's powers and authority." Rainville v. Lakes Region Water Co., 163 N.H. 271, 275 (2012).

Elster claims that its sale of meters to the Cooperative is an exempt transaction because the PUC has the statutory power to generally supervise "all public utilities" and has promulgated regulations related to recording outages, responding to outages, and "the inspection and calibration of meters." Doc. No. 12 at 21-22. The Cooperative replies that it is not a public utility and that the limited requirements imposed on it do not concern "the accuracy of meters, outages, or any other aspect of the transaction between" the parties. Doc. No. 13-1 at 18.

The "trade or commerce" implicated in this case is the sale of meters and related services. Neither party has singled out a statute or regulation specifically giving the PUC jurisdiction over the sale of meters. So, although the PUC regulates the Cooperative to some extent, the PUC does not regulate every aspect of the Cooperative's operation. Moreover, even if the PUC regulated the Cooperative's use of meters, its regulation of a product in one respect does not imply that every transaction

involving the product is exempt from the CPA. See State v. Empire Auto. Grp., Inc., 163 N.H. 144, 145-146 (2011) (where state body regulated sale of cars under installment contracts, car dealer's fraudulent placement of inspection stickers on cars sold under installment contracts did not occur in regulated trade or commerce); Elmo v. Callahan, 2012 DNH 144, 25-26 (where attorney represented clients in a regulated sale of securities, the practice of law constituted the relevant trade or commerce for CPA purposes).

Elster's argument that a different result is required by the New Hampshire Supreme Court's opinion in Rainville is a nonstarter. There, a public water utility made an allegedly fraudulent representation about water quality. See 163 N.H. at 279. The court determined that the PUC had jurisdiction over the provision of water, and the unlawful conduct related to that trade or commerce. See id. Elster correctly notes that the court focused on whether the PUC had jurisdiction over the relevant trade or commerce, not over the unlawful act. See Doc. No. 12 at 21. Here, as noted above, the parties have not singled out a specific statutory basis for the PUC's jurisdiction over the sale of meters. Accordingly, I decline to dismiss the Cooperative's CPA claim on this basis.

2. Implied Covenant of Good Faith and Fair Dealing Claim

The Cooperative alleged a breach of the implied covenant of good faith and fair dealing based on: (1) Elster's misrepresentations or omissions during negotiation of the contract; (2) Elster's refusal to repair or replace all meters with an improperly sized chip; and (3) Elster's refusal to reimburse the Cooperative for the costs of removing failed meters and installing replacements. See Doc. No. 1 ¶ 45-48. I have already rejected Elster's challenge to the Cooperative's good faith and fair dealing claim to the extent that it is based on misrepresentations during contract negotiations. Here, I consider Eisner's argument that the good faith and fair dealing claim must also be dismissed to the extent that it alleges that Elster is liable because it abused discretion granted to it under the contract.

Under New Hampshire law, the implied covenant of good faith and fair dealing takes different forms. "The various implied good-faith obligations fall into three general categories, the first dealing with conduct in contract formation; the second addressing termination of at-will employment contracts; and the third dealing with the limitation of discretion in contractual performance." Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 293 (1992). Elster's argument implicates only the third category of obligations.

"The New Hampshire Supreme Court has explained that contractual discretion can be exercised in a way that violates the duty of good faith and fair dealing only if 'a promise [is] subject to such a degree of discretion that its practical benefit could seemingly be withheld.'" Milford-Bennington R. Co. v. Pan Am Railways, Inc., 2011 DNH 206, 11 (quoting Centronics Corp. v. Genicom Corp., 132 N.H. 133, 144 (1989) (Souter, J.)).  Discretion exists where "a legal directive or contract term is indeterminate because it fails to identify a single specific action that is legally permitted, prohibited, or required under the circumstances."  Id. (quoting Steven J. Burton & Eric G. Andersen, Contractual Good Faith, § 2.3.2.1 at 45 (1995)).

The contract between Elster and the Cooperative does not give Elster the discretion to refrain from replacing, repairing, or refunding meters, or the discretion to pay or not pay costs associated with replacement.  Instead, the contract specifies that when certain conditions obtain, Elster "shall" replace, repair, or refund.  Doc. No. 12-1 at 7.  Indeed, although the Cooperative maintains that Elster has discretion, it twice states that the contract actually requires Elster to shoulder the costs of replacement.  See Doc. No. 25 at 83–84; Doc. No. 13-1 at 14–15.  Accordingly, Elster is correct in claiming that the Cooperative cannot base its good faith and fair dealing

claim on an alleged abuse of discretion granted to it under the contract.

### 3.  Unjust Enrichment Claim

At oral argument, the Cooperative explained that it was asserting its unjust enrichment claim as an alternative basis for recovery in the event the contract fails.  See Doc. No. 25 at 89-90.  Although it is true that an unjust enrichment claim ordinarily cannot be used to supplement the relief that a party is entitled to under a contract, Axenics, Inc. v. Turner Const. Co., 164 N.H. 659, 669 (2013), the Cooperative is entitled to plead that Elster is liable under alternative theories, see Fed. R. Civ. P. 8(d) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); Limone v. United States, 579 F.3d 79, 93 (1st Cir. 2009).[6]  Accordingly, I deny Elster's motion to dismiss the Cooperative's unjust enrichment claim.

## IV.  CONCLUSION

For the reasons explained above, I deny Elster's motion to dismiss (Doc. No. 11), except insofar as I have narrowed the

---

[6] Elster also attacks the Cooperative's breach of implied warranty claims.  Because I have not ruled on the enforceability of the contract's express disclaimer of the implied warranty, the implied warranty claim survives.

Cooperative's claims based on unjust enrichment and the implied
covenant of good faith and fair dealing.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 5, 2017

cc:  Derek D. Lick, Esq.
     Edward M. Kaplan, Esq.
     Christopher P. Fitzgerald, Esq.
     Gary T. Lombardo, Esq.
     Peter M. Durney, Esq.
     Stephen A. Fennell, Esq.
     Steven J. Barber, Esq.